IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> ODDRY ARNOLDO CABRERA TORREALBA, <br> a/k/a, LUIS ALEJANDRO BERDUGO BARRAZA, <br><br> Defendant. | 4:24CR3095 <br><br> INFORMATION <br> 18 U.S.C. § 371 <br> 18 U.S.C. § 2113(a) <br> 18 U.S.C § 1030 <br> 18 U.S.C. § 2 |

The United States Attorney charges:

<u>COUNT I</u>

1.      From on or about June 26, 2024, and continuing through on or about October 26, 2024, in the District of Nebraska and elsewhere, the defendant, ODDRY ARNOLDO CABRERA TORREALBA, a/k/a, LUIS ALEJANDRO BERDUGO BARRAZA, and other individuals, knowingly conspired and agreed with each other to commit acts and offenses against the laws of the United States, namely:

a.  to enter or attempt to enter a building used in whole or in part as a bank whose deposits were then insured by the Federal Deposit Insurance Corporation and by the National Credit Union Administration Board, with the intent to commit a larceny, in violation of Title 18, United States Code, Section 2113(a);

b.  to knowingly and with intent to defraud accessed and attempted to access a protected computer without authorization and by means of such conduct to further the intended fraud and obtain something of value, to wit: United States currency, in violation of Title 18, United States Code, Section 1030(a)(4); and

1

c. to knowingly cause the transmission of a program, information, code, and command and as a result of such conduct, intentionally cause damage without authorization to a protected computer, and cause loss to persons during a 1-year period from the defendant's course of conduct affecting protected computers aggregating at least $5,000 in value, and cause damage affecting 10 or more protected computers during a 1-year period in violation of 18 U.S.C. §§ 1030(a)(5)(A) and 1030(c)(4)(B).

2. The manner and means by which the defendant and his associates, including members of the conspiracy known and unknown, conducted and participated in the conduct of the affairs of the conspiracy included, but are not limited to, the following:

a. At a time no later than 2017, members of the conspiracy created and came into possession of the malware known as "Ploutus."

b. Members of the conspiracy began recruiting other coconspirators to deploy the Ploutus malware at ATMs throughout the United States.

c. Members of the conspiracy would identify particular financial institutions and, using encrypted messaging platforms like Telegram or WhatsApp, would direct other members to target those financial institutions.

d. Members of the conspiracy would obtain keys that were capable of opening ATMs and provide them to other coconspirators.

e. Members of the conspiracy would provide each other with step-by-step guides on how to deploy jackpotting malware onto ATMs.

f. Members of the conspiracy would travel in groups and in multiple vehicles to the locations of targeted financial institutions. The vehicles used by the conspiracy would be shared with other groups, and members of the conspiracy would often

2

travel in different groups. Members of the conspiracy would also arrange lodging at hotels or other rental accommodations.

g.  After receiving the locations of the targeted financial institutions, members of the conspiracy would travel to ATMs at the selected financial institutions. Members of the conspiracy would often conduct initial reconnaissance of the ATM by taking pictures of the exterior of the ATM and the lock on the ATM, and would note any other external security features such as a metal bar that would prevent members of the conspiracy from opening the ATM. Members of the conspiracy would also often open the hood or door of the ATM and take photographs of the computer within the ATM. Members of the conspiracy would often leave the location of the ATM but remain nearby in an effort to determine if the ATM had an alarm that triggered a law enforcement response, and whether that alarm had been activated in opening the hood of the ATM. Similarly, members of the conspiracy would often glue or otherwise obstruct the sensors of the ATM to prevent it from deploying an alarm.

h.  Members of the conspiracy would then take steps to deploy the Ploutus malware without authorization on to the ATM either by removing the ATM's hard drive and installing the malware on the hard drive before reinstalling the hard drive into the machine, replacing the ATM's hard drive with a foreign drive pre-loaded with the Ploutus malware, or by connecting an external device such as a thumb drive or raspberry pi device with the malware to then deploy on the ATM's computer.

i.  Members of the conspiracy often received direction and guidance on deploying the Ploutus malware from other coconspirators, including by connecting a laptop to the ATMs or the ATMs' hard drives, allowing other coconspirators to remotely access software to activate the Ploutus malware to complete the ATM jackpotting attack.

3

Members of the conspiracy would also often connect wireless keyboards and mice to the ATM's computer and join video calls with other members of the conspiracy who would provide instructions on how to deploy the Ploutus malware to complete the ATM jackpotting attack.

j. The Ploutus malware's primary purpose was to issue unauthorized commands associated with the Cash Dispensing Module of the ATM in order to perform unauthorized withdrawals of currency. The malware consists of a number of separate files with different purposes, including: files that interface with the ATM, specifically, the Cash Dispensing Module, and can manipulate the ATM to perform unauthorized currency withdrawals by sending programmatic instructions to perform dispensing operations within an ATM; files that contain anti-analysis measures to hinder forensic review, specifically software protection utilities to prevent reverse-engineering and debugging; and files that serve the function of deleting the malware from the system in an effort to conceal, create a false impression, mislead, or otherwise deceive employees of the financial institution from learning about the deployment of the malware on the ATM.

k. If the Ploutus malware was successful and the ATM dispensed currency to members of the conspiracy, the members of the conspiracy would collect the currency and leave the ATM location.

l. Once the currency had been obtained, members of the conspiracy on scene would often take their share of the criminal proceeds, which were typically a predetermined percentage or amount. The remaining criminal proceeds would then be distributed to other members of the conspiracy in a number of ways, including by using a courier to transport proceeds to other members of the conspiracy,

4

depositing proceeds in bank accounts of Limited Liability Corporations which functioned as funnel accounts for the conspiracy, depositing proceeds in Bitcoin ATMs to remit back to members of the conspiracy, sending proceeds via a money transmitting business to members of the conspiracy, and depositing proceeds in members of the conspiracy's bank accounts and then further disbursing the proceeds via payment applications such as Zelle to other members within the conspiracy, among other methods. Members of the conspiracy would also be reimbursed for travel expenses, such as gas and accommodations.

<u>Overt Acts</u>

In furtherance of the conspiracy and to effect its objects, at least one of the conspirators committed at least one of the following acts:

1. Between on or about October 25, 2024, and on or about October 26, 2024, ODDRY ARNOLDO CABRERA TORREALBA, a/k/a, LUIS ALEJANDRO BERDUGO BARRAZA, and individuals known and unknown to the Grand Jury attempted to commit a jackpotting attack at the ATM located at West Gate Bank, 1204 West O Street, Lincoln, Nebraska and attempted to obtain approximately $187,350.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT II</u>

From on or about October 25, 2024, to on or about October 26, 2024, in the District of Nebraska, the defendant, ODDRY ARNOLDO CABRERA TORREALBA, a/k/a, LUIS ALEJANDRO BERDUGO BARRAZA, knowingly caused and attempted to cause the transmission of a program, information, code, and command, and, as a result of such conduct, intentionally caused and attempted to cause damage without authorization to a protected

computer exclusively for the use of a financial institution and used by or for a financial institution, and to a protected computer used in and affecting interstate commerce and communication, and the offense would, if completed, have caused loss to persons during a 1-year period from the defendant's course of conduct affecting protected computers aggregating at least $5,000.00 in value.

In violation of Title 18, United States Code, Sections 1030(a)(5)(A), (c)(4)(B), and 2.

UNITED STATES OF AMERICA,
Plaintiff

LESLEY A. WOODS
United States Attorney
District of Nebraska

By:  s/ *Daniel Packard*
DANIEL PACKARD, #21991
Assistant U.S. Attorney
487 Federal Building
100 Centennial Mall North
Lincoln, NE  68508

The United States of America requests that trial of this case be held in Lincoln, Nebraska, pursuant to the rules of this Court.

 s/ *Daniel Packard*
DANIEL PACKARD, #21991
Assistant U.S. Attorney