IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

---

UNITED STATES OF AMERICA,
     Plaintiff,

vs.

ODDRY ARNOLDO CABRERA
TORREALBA, a/k/a Luis Alejandro
Berdugo Barraza,
     Defendant.

Case No. 4:24-CR-3095

**SENTENCING MEMORANDUM
ON BEHALF OF THE
DEFENDANT**

---

## I. INTRODUCTION

The Defendant, Oddry Arnoldo Cabrera Torrealba, also known as Luis Alejandro Berdugo Barraza ("Luis"), respectfully submits this memorandum in advance of his sentencing scheduled for June 11, 2026. Luis entered a plea agreement with the government under Federal Rule of Criminal Procedure 11(c)(1)(B), which prohibits him from requesting a departure or variance from the advisory guidelines. *See* D.E. 109 at V.C. The United States Probation Office has calculated an advisory guideline range of 70 to 87 months. *See* PSR at ¶ 112. Given the plea agreement, Mr. Barraza respectfully asks this Honorable Court to sentence him at the low end of his advisory range and impose a sentence of 70 months' imprisonment. In support of this request, Mr. Barraza states:

## II. DISCUSSION

The plea agreement commits the parties to a guideline calculation, but it says nothing about where within the resulting range a sentence should fall. Given the terms of Mr. Barraza's plea agreement, the following arguments are made in support of a sentence

1

at the low end of the guidelines and should not be construed as an argument for a downward variance.

### A. Mr. Barraza will face a longer sentence and harsher conditions in prison because he is not a United States citizen.

Under the First Step Act of 2018, U.S. citizens are entitled to substantial credits toward their prison sentence for successfully participating in various vocational and educational programs in prison:  up to a one-year reduction in their sentence, plus additional credits that allow the defendant to serve significant amounts of their sentence in home confinement rather than prison.  Under the statute, non-U.S. citizens are also entitled to these credits unless a final order of removal has been issued.  However, the Bureau of Prisons refuses to give non-U.S. citizens First Step Act credits, beyond the initial one-year reduction in their sentence, even in the absence of a final removal order.  That is, any additional credits that a person would otherwise receive by being able to serve time at home rather in prison are not being given to non-U.S. citizens, despite the fact that the First Step Act makes no such distinction.  *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, Reentry Servs. Div., *Updated Guidance on Application of Federal Time Credits to Pre Release Custody for All Non U.S. Citizens with an Active Detainer* (Jan. 30, 2025).

The impact for Luis is that, with a five-year sentence, he would serve more than one additional year than a similarly-situated U.S. citizen; with a 10-year sentence he would serve over two and a half years more.  Any version of the calculation adds a significant percentage to the time that Luis would be incarcerated.  To avoid a gross and unfair disparity between Luis, who has lived lawfully in the United States for 34 years, and

similarly situated U.S. citizens, recognition of the additional punishment he will face is critical.

Additionally, whenever Luis does complete his term of incarceration with the Bureau of Prisons, he will likely spend several additional months in ICE custody awaiting removal from the United States. This additional detention of Luis, where the simple fact of non-citizenship has an escalating effect on the length of his incarceration, should also be taken into consideration in determining his sentence. *See United States v. Lopez-Salas*, 266 F.3d 842, 847 (8th Cir. 2001) (finding a defendant's "alien status and the collateral consequences flowing therefrom may be an appropriate basis for departure."); *United States v. Thavaraja*, 740 F.3d 253, 263 (2d Cir. 2014) ("[A] district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family."); *United States v. Rodriguez*, No. 05-CR-960 (JPO), 2022 WL 158685, at *5 (S.D.N.Y. Jan. 18, 2022) (granting a motion for sentence reduction in part because it "is unknown how long following his release from prison [the defendant] will be kept in an immigration detention center before he is deported to Colombia, which will also add time to his term of incarceration"); *see also United States v. Smith*, 27 F.3d 649, 655 (D.C. Cir. 1994) ("[A] downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence[.]")

Courts have long factored into the lengths of sentences imposed the conditions in which the sentence has been or will be served. *See United States v. Francis*, 129 F. Supp. 2d 612, 614–15 (S.D.N.Y. 2001) (collecting cases). Luis's confinement will be harsher for

3

the duration of his incarceration because, as a non-U.S. citizen, the BOP will house him in a low security facility, as opposed to the minimum-security facility he would otherwise likely be in. Low security federal prisons impose far more restrictive conditions than minimum security facilities. Unlike the open, dormitory-style environment of a minimum-security facility, low security institutions have secure perimeters, controlled movement, and fewer privileges for those incarcerated. Prisoners housed in such facilities are often confined to small cells, rather than the more open living arrangements found in minimum security facilities. In addition, the inmate population at these institutions makes them inherently more dangerous. Minimum security facilities house non-violent offenders, whereas low security prisons include individuals convicted of crimes of violence. As a result, the likelihood of exposure to violence is significantly greater in these higher-security environments. Overall, the conditions, restrictions, and inmate population characteristics make low security facilities markedly more punitive and dangerous than minimum security facilities.

This combination of more severe conditions of confinement should be considered in sentencing Luis.

**B.      The loss table, which drives the guidelines calculation, overstates the offense**

Mr. Barraza respectfully submits that the advisory guideline range itself overstates the seriousness of his individual conduct. Specifically, the single largest drive of the guidelines range is an 18-level increase for a loss exceeding $3,500,000 under U.S.S.G. § 2B1.1(b)(1)(J), a figure derived from relevant conduct attributed to a sprawling, multi-crew

4

jackpotting conspiracy that the government itself values at more than $6,000,000. *See* PSR at ¶¶ 64, 80. This is out of proportion with the offense, particularly because most of the loss is not directly attributable to Mr. Barraza.

Consider this: here, there is an additional 18-point bump based entirely on the loss amount computed under §2B1.1. No other enhancement in §2B, the section applicable to this case, provides for anything near an 18-level upward adjustment. By contrast, in §2A, governing violent crimes, there are no double-digit enhancements. Examples of other double digit enhancements in the Guidelines include a 15 level enhancement for trafficking in portable rockets (2K2.1(b)(3)(A)) and for boarding air planes with bombs (2K1.5(b)(1)), and there are 12 level enhancements for committing a felony to promote terrorism (3A1.4(a)) and for obstruction of justice related to terrorism (2J1.2(b)(1)(C). The loss table therefore ignores the differences between violent and non-violent crimes and is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. Aug. 4, 2005).

In fact, throughout the past decade, legislators, law school professors, advocacy groups, the American Bar Association,the NACDL, and even former federal prosecutors have all criticized and challenged the application of this fraud loss table. This is largely because the fraud Guideline is not premised on reliable empirical data. *See* Mark W. Bennett et al., Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform, 102 Iowa L. Rev. 939, 979 (2017); *see also* Van Meter, *"One Judge Makes the Case for Judgment,"* The Atlantic (Feb. 25, 2016) (Mark

Osler, a professor of law at Baylor Law School and a former AUSA observed: "The whole structure is still guidelines-focused … That baseline seems so objective. It's a number, and there's this presumptive objectivity when you're looking at something that says, '121 months.' Because it's so specific, it has this veneer of science around it. Where, in reality, it's pretty much just made up.").

Notably, Luis does not object to the 18-point enhancement and is not requesting a downward variance on this basis because that would be contrary to the plea agreement. However, Mr. Barraza submits this argument as a basis for this Court to impose a sentence at the bottom of the guidelines range.

### III. CONCLUSION

For the reasons set forth above, Luis respectfully requests that this Honorable Court sentence him to a term of 70 months' imprisonment, a within-guidelines sentence at the low end of his advisory range, as permitted by his Rule 11(c)(1)(B) plea agreement.

Date: June 3, 2026

Respectfully submitted,

By*: /s/ Marissel Descalzo*
Marissel Descalzo, Esq.
Florida Bar No. 0669318
md@DescalzoLaw.com
Descalzo Law P.A.
2 South Biscayne Blvd., #2530
Miami, Florida 33131
Telephone: 305-489-1018
Counsel for Luis Alejandro
Berdugo Barraza
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I CERTIFY THAT, on this 3rd day of June, 2026 the foregoing was electronically transmitted via CM/ECF.

By: */s/ Marissel Descalzo*
Marissel Descalzo, Esq.

7