UNITED STATES OF AMERICA,

Plaintiff,

vs.

ODDRY ARNOLDO CABRERA
TORREALBA,a/k/a, LUIS ALEJANDRO
BERDUGO BARRAZA,

Defendant.

4:24CR3095

GOVERNMENT'S SENTENCING
MEMO

## **Background**

Pursuant to a plea agreement, 33-year-old Oddry Torrealba ("Torrealba") waived indictment and pled guilty on February 2, 2026, to an Information alleging two Counts: 1) conspiracy to commit bank burglary and computer fraud pursuant to 18 U.S.C. § 371; and 2) intentional damage to a protected computer, pursuant to 18 U.S.C. § 1030(a)(5)(A), (c)(4(B), and 2. (Filings 105, 106, 109). Count I is punishable by up to five years imprisonment and Count II is punishable by up to 10 years imprisonment.

Under the terms of the plea agreement, the government will move to dismiss the Indictment against Torrealba at the time of sentencing. (Filing 109, p.1). The parties have agreed to several offense characteristics/enhancements to include:

- 18-level increase: loss is more than $3,500,000 but less than $9,500,000. USSG § 2B1.1(b)(1).

- 2-level increase: 10 or more victims. USSG § 2B1.1(b)(2)(A)(i);

- 2-level increase: relocation of scheme to avoid law enforcement or substantial part of fraud scheme committed outside United States or sophisticated means. USSG § 2B1.1(b)(10);

- 4-level increase: defendant was convicted of an offense under 18 U.S.C. § 1030(a)(5)(A). Id. at pp.

Under the terms of the plea agreement, Torrealba may not request or recommend additional downward adjustments or departures. (Filing 109, p.9). There are no objections or motions requiring resolution at sentencing, which is set for June 11, 2026, at 9:00 am. (Filing 185, p.3).[1]

Torrealba's co-defendant, Carlos Padron ("Padron"), pled guilty to an Information alleging the same offenses Torrealba pled guilty to. Padron's sentencing is set for June 25, 2026 at 9:00 am. Both individuals are part of a larger conspiracy to steal from ATMs in which over 100 defendants are charged in Omaha ("Omaha Defendants") across several Indictments. *See* 8:25CR190, 8:25CR242, 8:26CR7, 8:26CR25. Of the Omaha Defendants, one has pled guilty, and his case is set for sentencing in front of Judge Buescher on August 19, 2026. (8:25CR:190, Filing 402).

The probation office prepared a Revised Presentence Investigation Report (RPSR). Counts I and II group for guideline calculation purposes. RSPR ¶ 80. After applying reductions for acceptance of responsibility and zero-point offender, Torrealba's base offense level is 27 and his criminal history category is I resulting in an advisory sentencing **Guideline range of 70 – 87 months imprisonment.** RPSR ¶ 119.

---

[1] In April, at the government's request, sentencing was continued so that it could make further efforts contacting victim banks. The government has now had an opportunity to send victim impact statements to all victim banks. Specifically, the United States Attorney's Office has coordinated with the FBI, who is keeping a running list of victim banks and credit unions, to ensure that all banks anywhere in the United States tied to Nebraska-charged defendants have been mailed a victim impact statement. This list of victim banks increases regularly as the government learns of new jackpotting attacks that occurred and which are part of the same conspiracy.

The government anticipates asking the court to adopt the RPSR in its entirety. For reasons that follow, the government seeks a **sentence at the high end of the advisory Guideline range along with an order of restitution**.

<u>Argument</u>

**A. 18 U.S.C. 3553(a) Factors – Nature and Circumstances of the Offense**

Facts underlying Torrealba's convictions warrant a significant prison sentence that falls at the high end of the advisory Guideline range. Torrealba played a critical role in a month's long jackpotting spree of at least 17 jackpotting incidents across multiple states, resulting in a more than $1.6 million in loss. Torrealba performed an active role in the jackpotting by unlocking the hood and manipulating internal components of the ATMs, resulting in the unauthorized distribution of cash.

In furtherance of the conspiracy, Torrealba and his co-conspirators took steps to avoid detection by both the banks and law enforcement. They wore disguises, donned face masks, used unregistered Facebook-purchased vehicles, and communicated using encrypted applications. They scouted out vulnerable victim banks, worked in the middle of the night, and used self-deleting malware to hide their tracks. Following his arrest, Torrealba gave law enforcement a false name – "Luis Barraza" – and had previously obtained a fake Colombian passport. He continued to mis-represent his identity to the judiciary in Lancaster County Court while charged in State court, to the Immigration Court during immigration proceedings, and to the Magistrate Judge in this district during his initial appearance. The false identity helped Torrealba remain unknown and commit his crimes.

As a direct result of Torrealba's conduct, not only did the victim banks suffer more than $1.6 million in loss, but the banks were significantly and financially impacted in additional ways. As merely one example, West Gate Bank branches in Lincoln spent over $23,000 to protect

against future jackpotting by installing ATM locks and encrypting hard drives. In another example, the Washington State Employees Credit Union spent over $600,000 to pay armored vehicles to travel to all of the ATM branches around Seattle, Washington to empty ATMs of cash to prevent further thefts.

Additionally, investigating jackpotting attacks consumes significant time and resources from the law enforcement and banking communities. Each jackpot typically involved response and investigation from the victim banks, followed by response from local law enforcement, and then in some cases, further investigation by federal law enforcement. Frequently, smaller banks in smaller towns were targeted. The victim impact statement submitted by Dayspring Bank in Gothenburg, Nebraska (loss of $111,200 on April 12, 2025) is one such example showing a snapshot of the resources involved in simply initiating an investigation, determination areas of risk, and identifying solutions.

Torrealba's illegal actions had a ripple effect on these financial institutions.

**B. 18 U.S.C. § 3553(a) Factors – Torrealba's History and Characteristics**

Although this case is Torrealba's second felony conviction for theft, he somehow benefits from a two-level reduction for being a zero-point offender because his foreign convictions do not count as criminal history points under the Guidelines. *See* U.S.S.G. § 4A1.2(h).[2] Incarceration has not deterred Torrealba.

Torrealba's repeated felony convictions for jackpotting justify a high-end Guideline sentence.

---

[2] If Torrealba's felony theft conviction occurred in the United States, his base offense level would be 29 (no zero-point offender). At criminal history category 3 (3 points for more than 13 months imprisonment), his Guideline range would be 97 to 121 months imprisonment.

4

### C. Loss and Restitution

The loss calculation for this jackpotting conspiracy has two primary purposes. First, in determining the offense conduct, the offense level is increased based on the amount of the loss. U.S.S.G. § 2B1.1(b)(1). Second, in the case of an offense committed by fraud or deceit or in which there is an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss. U.S.S.G. § 5E1.1; *see also* 18 U.S.C. § 3663A(a)(1) and (c)(1). Although loss for sentencing purposes and loss for restitution purposes is often calculated in the same manner, the two determinations serve different purposes and thus may differ depending on the relevant facts. *United States v. Lange*, 592 F.3d 902, 907 (8th Cir. 2010).

For purposes of § 2B1.1(b), loss is calculated as the greater of the actual or intended loss. Actual loss is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 cmt. n.3(A)(i). And "reasonably foreseeable pecuniary harm" is further defined as that harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense. *Id*. cmt. n.3(A)(iv). Intended loss, by comparison, includes any "pecuniary harm that was intended to result from the offense," including harm that was "impossible or unlikely to occur." *Id*. cmt. n.3(A)(ii). Ultimately, this Court needs to make a "reasonable estimate of the loss." *Id*. cmt. n.3(C); *United States v. Rice*, 699 F.3d 1043, 1049 (8th Cir. 2012).

The Eighth Circuit has stated:

> In the case of a jointly undertaken criminal activity, relevant conduct includes all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity and that occurred during the commission of the offense of conviction. A co-conspirator's actions can count as relevant conduct, even if the defendant wasn't present when the crime occurred. The focus of our analysis is on the scope of the defendant's participation, not on the scope of the conspiracy as a whole. It is the

Government's burden to prove the loss amount by a preponderance of the evidence.

*United States v. Miller*, 41 F.4th 1019, 1024 (8th Cir. 2022) (internal citations and quotations omitted). The Eighth Circuit has further held, "[i]f a conspiracy is effected while the defendant is incarcerated and he has not withdrawn from the conspiracy, his responsibility is curtailed only if those acts were not reasonably foreseeable at the time of his incarceration." *United States v. Maxwell*, 778 F.3d 719, 735 (8th Cir. 2015). Finally, the Eighth Circuit has held that where there is "a close relationship between" coconspirators, and the coconspirators have demonstrated a "substantial level of commitment to the conspiracy," other conspirators' actions in furtherance of the conspiracy are "reasonably foreseeable." *United States v. Lyons*, 556 F.3d 703, 707 (8th Cir. 2009) (*quoting United States v. Pizano*, 421 F.3d 707, 734 (8th Cir.2005)).

In Torrealba's case, the parties agreed, and the RPSR concluded, that the conspiracy loss is over $3,500,000. This loss amount encompasses the loss directly attributable to Torrealba as set forth in the factual basis of his plea agreement, as well as the loss attributable to the larger jackpotting conspiracy. First, it encompasses attempted jackpot attacks in which cash was present in the machine, but not stolen (i.e., intended loss). Second, it encompasses loss tied to jackpotting attacks occurring after Torrealba's October 26, 2024, arrest, but before he renounced his involvement in the conspiracy. Because further jackpotting attacks were reasonably foreseeable to Torrealba at the time he was incarcerated, and because there is no indication he withdrew from the conspiracy until at least May 23, 2025, it is appropriate to hold him accountable for loss caused by codefendants, which, at the time of his plea, amounted to at least over $3.5 million.

As of this writing, at least five victim banks are seeking restitution. The government respectfully requests this court enter a restitution order as part of sentencing that holds Torrealba jointly and severally liable for the entire amount of restitution, or $1,537,696.

## Conclusion

The government respectfully recommends that the Court sentence Torrealba to a prison sentence that falls near the top of the advisory Guideline range. At 33 years of age, and having been sentenced to prison for theft previously in another country, Torrealba helped steal more than $1 million from at least 17 ATMs across the United States. He avoided detection by using disguises and obtaining a fake identity. He belonged to a larger conspiracy that was well-organized, and which later helped fund a designated terrorist organization, Tren de Aragua. A sentence at the top of the Guideline will promote respect for the law, and will protect the public from Torrealba's theft and its impact on Nebraska communities.

Torrealba's sentence must include an order of restitution. The government asks this Court to consider all of the victim impact statements, including all restitution requests. As of this writing, the government agrees with a restitution order in the amount of $1,537,696 paid out to the five banks that have requested restitution. The government has reviewed the proposed terms and conditions of supervised release in the RPSR and has no objections to those terms.

Respectfully submitted,

UNITED STATES OF AMERICA, Plaintiff

LESLEY WOODS
United States Attorney
District of Nebraska

By: _s/ Daniel Packard_
DANIEL PACKARD, #21991
Assistant U.S. Attorney
100 Centennial Mall North, #47
Lincoln, NE 68508
E-mail: daniel.packard@usdoj.gov